IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:09-cr-024-WHA |
| | ) | [wo] |
| JOHN ALBERT FLORES | ) | |

## **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pending before the Court is the Defendant's *Motion to Suppress* (Doc.19, filed 3/17/09), the Government's *Response to Defendant's Motion to Suppress* (Doc. 25, filed 3/30/09), the *Defendant's Reply to Government's Response to Motion to Suppress* (Doc. 26 filed 4/1/09), the Government's *Supplemental Response to Defendant's Motion to Suppress* (Doc. 27 filed 4/2/09), and *Defendant's Post-Hearing Memorandum* (Doc. 36, filed 4/26/09). Defendant John Albert Flores (hereinafter "Flores" or "Defendant") seeks to exclude the fruits from the search of his tractor trailer on February 10, 2009, and any statements he made to law enforcement which Flores alleges are tainted fruit from the poisonous search. After the evidentiary hearing and due consideration of briefs, arguments, exhibits, and applicable law, the Magistrate Judge recommends that the District Court **DENY** the motion to suppress (Doc. 19).

### I. FINDINGS OF FACT

Corporal J.S. Dunn ("Dunn") is a Montgomery Police Officer assigned to the Highway Enforcement Detail ("HED"). HED enforces traffic laws and during traffic stops,

takes "the opportunity to observe the driver and occupants in the vehicle" to ferret out contraband and generally enforce laws of the State of Alabama. (Tr. at 95). Corporal Dunn's HED training includes special training in rules and regulations applicable to motor carriers and means used to conceal contraband. (Tr. at 96-99). On February 10, 2009, Dunn and Corporal D.T. Stallworth ("Stallworth") were traveling north in their patrol car on Interstate 85 near the Mitylene exit. The officers were in the left lane when Dunn saw a tractor trailer ahead in the right lane. Dunn put on his blue light because the truck was following too closely behind a blue car. According to Dunn, the truck was so close to the blue car that an accident would have been unavoidable if the driver in the blue car were to suddenly stop. (Tr. at 100). A video camera began to record the incident when Dunn put on his blue light. Ordinarily the video camera would capture any conversations between Officer Dunn and anyone else until Officer Dunn turned off the blue light. Unbeknownst to Dunn, his microphone was defective and the camera did not record any conversations. (Tr. at 102-03; 141).

After Dunn put on his blue light, the truck pulled off the interstate. Dunn went to the passenger door of the truck. It was not until Dunn stood on the step of the passenger door that he saw the driver, Flores, for the first time. (Tr. at 106). Dunn opened the door after Flores said the door was open. Dunn saw the truck had a several custom features and a flat screen television. (Tr. at 106-07). Flores seemed to Dunn to be much more nervous and talkative than others whom he pulled over for traffic infractions. (Tr. at 107). According to Dunn, Flores' nervous demeanor did not change even after he told Flores he was going to

issue him a warning citation as opposed to a regular ticket. (Tr. at 108). Dunn asked for Flores's logbook to help him determine whether Flores had been driving too long without adequate rest. (Tr. at 105). After Flores gave Dunn his documents (insurance, registration, bill of lading and logbook), the two went to Dunn's car. Flores stood outside the car with Stallworth while Dunn sat in the car and ran the necessary checks. (Tr. at 108-10). None of the database queries revealed any significant information about Flores. (Tr. at 109).

     The logbook entries revealed Flores picked up a load of cucumbers two days earlier in Hidalgo, Texas but he spent the next night in Houston, Texas before setting off for his destination of Mt. Olive, North Carolina. According to the logbook, Flores had no loads between December 15, 2008 and February 8, 2009. From the totality of the circumstances Dunn began to suspect Flores was involved in criminal activity beyond the traffic infraction. (Tr. at 116-20). Specifically, Dunn thought the large crucifix (18 inches long) laying on the floor and the rosary were items to project a good guy image. (Tr. at 106-07). The custom features in the truck plus the flat screen television were, in Dunn's opinion, expensive. The expensive features stood out more to Dunn because in his experience, most truckers are paid for miles driven and Flores was off the road between December 18, 2008 and February 8, 2009. (Tr. att 120-21). In the cab, Dunn saw several air fresheners. In Dunn's training and experience, air fresheners, particularly multiple air fresheners are used to mask the smell of contraband. (Tr. at 121; 167; 170). It was a cool day but Dunn saw Flores wipe away sweat from his brow. (Tr. at 108). In addition, Flores's point of origin was Hidalgo, which is located in the valley area of Texas along the Mexico border and is a source location for

contraband, particularly narcotics. (Tr. at 117). Further, the defendant's demeanor seemed to Dunn to be more consistent with a person smuggling contraband than a person caught committing a traffic infraction. Flores told Dunn he had visited overnight with his mother in Houston, Texas after he picked up the load of produce in Hidalgo, Texas. Flores attributed the layoff from December to February 8, 2009 to his inability to get a load of produce to haul from Texas. From talking with other truckers, Dunn knew it was relatively easy to get a load of produce from Texas to haul eastward during the down period but it was difficult to get a load of produce to haul west and south during during the down period. (Tr. at 118-21).

Dunn wrote out the warning ticket and gave all of the documents back to Flores. (Tr. at 109-10). As Flores began to walk away, Dunn told Flores he was an interdiction officer and asked Flores if he had any contraband. Flores said no but offered to let Dunn search his truck. (Tr. at 110-11). Dunn did not give Flores a written consent form to sign because he thought the audio-recording equipment would capture the consent. (Tr. at 112). Dunn turned his attention to the trailer after he found nothing significant inside the truck cab. Flores stood between the car and trailer while Dunn searched the cab and trailer. When Dunn examined the wind tunnel, a portion of the refrigeration unit, he saw fresh tool marks on the bolts and the wind tunnel was not properly secured to the trailer. Dunn became very suspicious at that point. (Tr. at 113). His suspicions at this point were high because shippers will not load produce into a trailer which has a faulty wind tunnel. (Tr. at 193-94).

Dunn also saw that the back of the trailer did not have a seal on the door. The missing seal heightened Dunn's suspicions because often produce shippers put a seal on the trailer

Page 4 of 14

to prevent theft or tampering with the cargo by the driver. (Tr. at 115-16). When Dunn opened the door he saw negligible top ice on the cucumbers. Top ice is a thin layer of ice which shippers put on top of fruits and vegetables to ensure the produce stays fresh in transit. (Tr. at 123-24). Dunn saw no contraband in plain view, but when he stuck a flexible, fiber optic scope down a bolt hole in the refrigeration unit, he could see the unit had a steel box covered in lead. From his training and experience, Dunn knew that smugglers who bring contraband into the country use lead to shield their contraband from the Xray machines which customs uses to examine check truck loads. (Tr. at 131; 134-35; 185). Inside the box officers found approximately 100 kilograms of cocaine. (Tr. at 3-4; 137). Dunn estimated fifteen to twenty minutes elapsed between receiving Flores's permission to search the vehicle and his first sighting of the suspicious refrigeration unit where cocaine was discovered. (Tr. at 114).

Devin Whittle ("Whittle"), an agent with the Drug Enforcement Administration, was called to the scene of the stop after the discovery of the cocaine. Whittle gave Flores his rights warning, and Flores indicated he understood those rights. Flores and Whittle had a brief conversation on the scene after this warning. On the way to the DEA office Flores gave incriminating statements to Whittle which indicate Flores knew the contraband was in the truck. (Tr. at 210-12). At the DEA office, Whittle renewed the rights warning to Flores, who initially waived his rights and talked again. Flores subsequently invoked his right to an

attorney, whereupon Whittle did not question him further. (Tr. at 212-13).[1] Whittle testified he did not threaten or coerce Flores into making any incriminating statements. (Tr. at 211).

Flores testified Dunn asked "if it was okay for him to look in the truck, and I told him he could look in the truck." He said Dunn did not use the word "search," and he thought the process would be akin to a Department of Transportation inspection, but not an intrusive search of the trailer. (Tr. at 217). Flores said he did not feel he was free to leave, and did not interrupt the search because he believed "[T]hat would be undermining authority, and officers don't like you to do that, so you got to comply." (Tr. at 218). Flores said his truck did not have a seal on the trailer door because the produce was picked up in a location twelve miles away from the ice plant which sprayed on the top ice. (Tr. at 218-19). Flores said there was no seal on his trailer because the shipper of the produce did not require one, and he used a padlock to safeguard the merchandise. (Tr. at 220). Flores said Dunn did not threaten him to obtain consent to look inside his truck. (Tr. at 227-29).

On February 18, 2009, the Grand Jury for the Middle District of Alabama indicted Flores for the knowing possession with intent to distribute 5 kilograms or more of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). *See* Doc. 11. On March 17, 2009, Flores filed his motion to suppress evidence discovered during the search and statements taken by law enforcement. *See* Doc. 19. Flores claims the search offends the Fourth Amendment because it was not supported by reasonable suspicion; lacked probable

---

[1]Testimony shows Flores was issued rights warnings by Walter Thrower (DEA) and Stallworth (MPD) prior to being warned and questioned by Agent Whittle. (Tr. at 18, 77, 86).

cause under the totality of the circumstances; and was undertaken without legal consent. Flores argues the fruits of the interrogation warrant suppression because Dunn's questions had no relation to the basis for the traffic stop, and lacked the warnings required under *Miranda v. Arizona*, 384 U.S. 436 (1966). Finally, Flores claims the stop and statements were the product of racial profiling which contravenes the Equal Protection Clause. The United States responds the traffic stop was initiated for a legal purpose and Flores's consent to search was voluntary and legal. Flores and the United States concede the admissibility of all evidence rests upon the underlying search. The Court heard argument and received evidence from the parties on April 7, 2009.

## II. DISCUSSION AND ANALYSIS

### A. The Fourth Amendment Claim

Flores seeks suppression under the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 516 U.S. 806, 810, 116. S.Ct. 1769 (1996); *Terry v. Ohio*, 392 U.S. 1, 19-20, 88 S.Ct. 1868 (1968) (supporting stop where "the officer's action was justified at its inception"). Dunn testified he initiated the stop in this case because Flores was following the car ahead of his truck so closely that it posed a threat to motorist safety. Flores challenged Dunn's decision to stop him and not

another vehicle which may have committed the same violation, but he did not establish the stop had no basis in law. (Tr. at 159). The facts support Dunn's decision to stop Flores for a traffic infraction. *See United States v. Pruitt*, 174 F.3d 1215, 1217 n.1 (11th Cir. 1999).

Once a stop takes place, courts look to whether an officer's "subsequent actions are reasonably related in scope to the circumstances which justified the interference in the first place." *Terry, id*. The Eleventh Circuit has stated that, under *Terry*, a traffic stop "may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003). In this case, Dunn assembled articulable facts which, taken together with rational inferences from those facts, justified his impression that Flores was engaged in criminal activity. Flores's logbook showed Dunn that he had not driven for almost two months. While Flores attributed this inactivity to his inability to obtain a load, Dunn had contrary information that loads from Texas were readily available for transport. Dunn was also aware that Flores's point of origin was a source area for narcotics. (Tr. at 116-17). Flores's inactivity, and corresponding lack of income, seemed inconsistent with Dunn's impression of Flores's truck, which was equipped with expensive amenities. (Tr. at 121-22). Dunn's review of Flores's log, coupled with his knowledge of the drug and trucking industries, led him to ask for consent to search Flores's vehicle after he issued a warning citation to Flores. Extending at traffic stop for further questioning beyond that related to the initial stop is permissible where an officer has reasonable cause, or the encounter has become consensual. *Pruitt*, 174 F.3d at 1220.

**Reasonable Cause**

Dunn testified his request for consent to search was based upon his cumulative suspicions that criminal activity was afoot. Although the "reasonable suspicion" standard is less demanding than probable cause, it must be more than an "inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989). *Sokolow* directs courts to consider "the totality of the circumstances - the whole picture" when evaluating the validity of officers' actions. 490 U.S. at 7; *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990). "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same - and so are law enforcement officers." *Sokolow, id*. at 8. *See also United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2005)(reaffirming officer's duty to investigate where reasonable suspicion exists).

Flores disputes the existence of "reasonable suspicion" at this stage of the stop and views his continued detention after issuance of the warning as the turning point from lawful stop to a Fourth Amendment violation which requires suppression. (Doc. 19 at 7). His argument against reasonable suspicion does not override the combination of facts and information which Dunn, as a trained officer, used to make inferences and deductions "that might well elude an untrained person." *United States v. Bautista-Silva*, ___ F.3d ___, 2009 WL 1270350 at *4 (11th Cir. May 11, 2009), quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744 (2002). The Eleventh Circuit also stated in *Bautista-Silva* that a "divide-

and-conquer" approach to factual analysis is not required, and "reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation.'" *Bautista-Silva*, 2009 WL 1270350 at *5, quoting *Arvizu* at 267. This court's review of the testimony leads it to find reasonable suspicion to search the truck

### **CONSENT**

Flores contends his consent was not lawful and cannot support the search of his vehicle. He testified he thought Dunn would simply look inside his truck and he did not interfere because he felt he had to submit to authority, especially in light of Dunn's military-style uniform. (Tr. at 217-18; Doc. 36 at 6). Flores stated he was not told he could leave, but admitted he was not threatened or promised anything in return for his consent. (Tr. at 226-27). The video recording of the stop shows he watched Dunn enter the trailer portion of his vehicle and, though the recording shows he appeared somewhat surprised as the search continued, he did not interfere with Dunn's actions. The Supreme Court has made clear that the "Constitution does not require that a lawfully seized person be advised that he is 'free to go' before his consent to search will be recognized as voluntary." *Ohio v. Robinette*, 519 U.S. 33, 45, 117 S.Ct. 417 (1996) (Stevens, J., dissenting). This simple rule supports the validity of Flores's consent, and the ensuing search is likewise valid under the Fourth Amendment.

### B. **The *Miranda v. Arizona* Claims**

Flores asserts two *Miranda* claims - one which precedes his arrest, and a second which asserts his wishes after being warned were not respected. The pre-arrest claim asserts he was

interrogated on matters unrelated to the stop, and that Dunn used the stop to possibly develop cause for other police activity. He cites *United States v. Glen-Archila*, 677 F.2d 809 (11th Cir. 1982) for the proposition that he should have received warning that Dunn was investigating him, and Dunn's failure to warn requires suppression under *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602 (1966). It has long been held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* , 384 U.S. at 444, 86 S.Ct. 1602. Commonly known as a *Miranda* warning, the decision requires a suspect receive a warning about his constitutional rights prior to a custodial interrogation.

Whether the *Miranda* warning is warranted is contingent upon whether the defendant was subject to interrogation while "in custody" and is "a mixed question of law and fact." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). The Supreme Court stated a *Miranda* warning need not always precede conversation between and officer and motorist in *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138 (1984). The Eleventh Circuit discussed the *Berkemer* case at length in *United States v. Acosta*, 363 F.3d 1141, 1149-50 (11th Cir. 2004)(explaining *Miranda* warning is not required when traffic stop is not "police dominated,"occurs in public, and detained motorist is not vulnerable). The facts here demonstrate Dunn did not ask Flores an excessive number of questions. In fact, Dunn's independent observations and review of Flores's logbook formed the bulk of reasonable cause to ask for consent. Unfortunately for Flores, the questions asked by Dunn contributed

significantly to his decision to investigate further. Regardless, Dunn was not required to give Flores *Miranda* warnings prior to asking him any questions concerning his driving practices.

In addition, controlling caselaw clearly permits officers to ask motorists questions about matters not directly related to a traffic stop if the questions do not prolong the time reasonably required to complete tasks related to the stop. This rule from *Muehler v. Mena*, 544 U.S. 93, 101, 125 S.Ct. 1465 (2005) has been favorably cited by the Eleventh Circuit, and forecloses Flores's claim that all questions unrelated to the stop were improper. *See Hernandez*, 418 F.3d at 1209 n.3.

Flores's post-arrest *Miranda* claim asserts narcotics officers ignored his decision to remain silent and persuaded him to make a statement even though he had invoked his rights under *Miranda*. Hearing testimony showed Flores received *Miranda* warnings from two DEA agents and one MPD officer. Although Flores argues his rights under *Miranda* were violated, he did not testify as to any infringement of his rights in this regard. (Doc. 19, at 9; Doc. 26, at 2-3). The court's review of the hearing transcript does not reveal any inconsistent testimony by the officers to support this claim.

### C. The Equal Protection Claim

Lastly, Flores claims his ethnicity improperly motivated Dunn to search for grounds to search his vehicle, in violation of the Equal Protection Clause. *Whren* held "the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no

role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 516 U.S. at 813. Thus, *Whren* requires this court look first for a reasonable basis for a traffic stop, and if found, an officer's subjective intentions are to be discarded. The facts demonstrate a valid basis for the stop in this case, and there are no grounds to address Flores' equal protection claim within this suppression proceeding.

### III.  CONCLUSION

Pursuant to the foregoing findings and conclusions, it is the **RECOMMENDATION** of the Magistrate Judge that Defendant's *Motion to Suppress Evidence* (Doc. 19) be **DENIED**.

It is further **ORDERED** that the parties shall file any objections to the said Recommendation not later than **May 28, 2009.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d

33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 14th day of May, 2009.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE